Case No. 24-1105
Case No. 24-1284 (Consolidated)

[ORAL ARGUMENT NOT YET SCHEDULED]

**UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

---

MICHAEL SOLONDZ

*Petitioner,*

v.

FEDERAL AVIATION ADMINISTRATION

*Respondent,*

---

ON APPEAL FROM FINAL AGENCY DECISION OF THE FEDERAL
AVIATION ADMINISTRATION (PI # 2041673; July 9, 2024)

**PETITIONER MICHAEL SOLONDZ'S
OPENING BRIEF (APPENDIX DEFERRED)**

---

**STINSON LLP**
Zane A. Gilmer (CO Bar # 41602)
1144 Fifteenth Street, Suite 2400
Denver, CO 80202
Tel: (303) 376-8416
Email: zane.gilmer@stinson.com

Brandon R. Nagy (D.C. Bar # 1024717)
1775 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006
Tel: (202) 728-3010
Email:  brandon.nagy@stinson.com
*Counsel for Petitioner Michael Solondz*

## <u>CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES</u>

**I.      Parties and *Amici***

Petitioner/Appellant, Michael Solondz, was the applicant below.

Respondent/Appellee, the Federal Aviation Administration, was the agency below.

There are no *amici*.

**II.     Rulings Under Review**

The final agency decision under review is the decision of the Federal Aviation Administration, through the Air Surgeon, issued by letter dated July 9, 2024 (PI # 2041673) (the "Denial"). A true copy of that decision is found in the Joint Deferred Appendix [000022-28].

Also under review is the Manager of the Aerospace Medical Certification Division's April 10, 2024 letter denying Solondz's reconsideration request for a Special Issuance (PI # 2041673). [000038-000039] Solondz initiated appeal No. 24-1105 following this denial. Afterwards, on July 9, 2024, the FAA issued the Denial, which described the April 10, 2024 letter as "erroneously issued" (at page 5). A true copy of that decision is found in the Joint Deferred Appendix [000038-39].

**III.    Related Cases**

This appeal is a consolidation of two appeals, each of which present the same final agency decision for review:

CORE/3526649.0002/193417506.1

- *Solondz v. FAA*, D.C. Cir. No. 24-1105

- *Solondz v. FAA*, D.C. Cir. No. 24-1284

No other cases are related.

CORE/3526649.0002/193417506.1

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ................................................................................ ii

    I.   Parties and *Amici* ................................................................ ii

    II.  Rulings Under Review ......................................................... ii

    III. Related Cases ..................................................................... ii

TABLE OF AUTHORITIES ............................................................ vi

GLOSSARY .................................................................................... viii

STATEMENT OF JURISDICTION AND STANDING ...................... 1

PERTINENT STATUTES AND REGULATIONS .............................. 2

STATEMENT OF ISSUES PRESENTED ......................................... 2

STATEMENT OF THE CASE .......................................................... 3

    1.  Background and Medical History ....................................... 3

    2.  Procedural History ............................................................ 8

SUMMARY OF ARGUMENT ........................................................ 15

ARGUMENT .................................................................................. 16

    I.   Applicable Regulations and Standard of Review ................ 16

    II.  The FAA abused its discretion, acted arbitrarily, capriciously, and contrary to law when it denied Solondz's request for a Special Issuance based on his use of Remeron. ............................................................. 20

        1.  The FAA failed to consider, much less weigh, Solondz's individual medical records concerning his use of Remeron when it denied his request for a Special Issuance, in contravention with 14 C.F.R. § 67.401. .................................................................. 20

        2.  The FAA arbitrarily refused to consider Solondz's individual medical records despite conducting case-by-case reviews for airmen who use similar medications ............................................... 24

        3.  Solondz's uncontroverted medical records establish that the way Solondz self-administered Remeron (a) was effective in treating the underlying medical issues and (b) did not cause a safety concern for anything on the ground or in the air. ................ 27

    III. The FAA's reliance on the Food and Drug Administration's ("FDA") prescribing information and a single generalized study for the proposition

that use of Remeron may cause somnolence in some patients who use the drug is insufficient to support its denial of Solondz's request for a Special Issuance. ........................................................................................................34

    1.    The FAA's position creates an arbitrary and capricious blacklist against the use of Remeron, simply because there are reported instances of somnolence in some patients who take it. ..........................................35

    2.    The FAA's reliance on a 1998 study is similarly misplaced. .............37

IV.    The FAA's pretextual references to other medical issues are an abuse of discretion, arbitrary, capricious, and contrary to law. .................................39

    1.    Solondz previously disclosed the optic neuritis and malignant melanoma issues, and the FAA never previously relied on these issues as the basis for a denial. ....................................................................40

    2.    The medical evidence demonstrates optic neuritis is not a safety concern; any denial based upon optic neuritis is arbitrary, capricious, and contrary to law. ...........................................................................43

    3.    The medical evidence demonstrates that a prior melanoma is not a safety concern; any denial based upon melanoma is arbitrary, capricious, and contrary to law. ..........................................................46

    4.    It is arbitrary, capricious, and contrary to law to deny Solondz a Special Issuance based on a single atrial fibrillation event over 20 years ago. ...............................................................................................49

    5.    It is arbitrary, capricious, and contrary to law to deny Solondz a Special Issuance based on a sleep apnea condition. .......................................50

RELIEF SOUGHT ..................................................................................................52

CONCLUSION .......................................................................................................54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................56

CERTIFICATE OF SERVICE ...............................................................................57

CORE/3526649.0002/193417506.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aman v. FAA.*,
856 F.2d 946 (7th Cir. 1988) ...............................................................26

*Erwin v. FAA*,
23 F.4th 999 (D.C. Cir. 2022)...................................17, 20, 21, 22, 23

*Friedman v. FAA*,
841 F.3d 537 (D.C. Cir. 2016).........................................13, 14, 17

*Kort v. Burwell*,
209 F.Supp.3d 98 (D.D.C. 2016).........................................24, 25, 26

*Loper Bright Enter. v. Raimondo*,
144 S.Ct. 2244 (2024)........................................................18, 19, 20

*McHenry v. Bond*,
668 F.2d 1185 (11th Cir. 1982) ...................................26, 27, 28, 29, 30

**Statutes**

49 U.S.C. § 46110(a) ...........................................................................1

Administrative Procedure Act...................................................................18

Air Commerce Act of 1926, Pub. L. No. 69-254, 44 Stat. 568 ................18

Civil Aeronautics Act of 1938, Pub. L. No. 75-706, 52 Stat. 973....................18, 19

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 ...........................19

**Other Authorities**

14 C.F.R. pt. 67, subpt. B.........................................................................2

14 C.F.R. pt. 67, subpts. B, C, D ...........................................................6

14 C.F.R. § 16.247(a).............................................................................1

14 C.F.R. § 61.53 ...............................................................................5, 6

CORE/3526649.0002/193417506.1

14 C.F.R. §§ 67.107(c), .207(c), and .307(c)............................................52

14 C.F.R. § 67.401 ..........................................................2, 7, 15, 16, 20

14 C.F.R. § 67.401(a)................................................16, 23, 24, 52

14 C.F.R. § 67.401(c)................................................16, 17

14 C.F.R. § 67.409 ............................................................2

**Court Rules**

D.C. Cir. R. 15 ............................................................1

Fed. R. App. P. 15(a) ............................................................1

Fed. R. App. P. 32(a)(6) ............................................................56

Fed. R. App. P. 32(a)(7)(B) ............................................................56

Fed. R. App. P. 32(f) ............................................................56

Fed. R. App. P. 32(a)(5) ............................................................56

CORE/3526649.0002/193417506.1

# GLOSSARY

Air Surgeon – The FAA's Federal Air Surgeon.

Air Surgeon Denial (or the "Denial") – The FAA's Air Surgeon's July 9, 2024 letter denying Solondz's reconsideration request for a Special Issuance. [000022-000028] Solondz initiated appeal No. 24-1284 following this denial.

AMCD – FAA's Aerospace Medical Certification Division.

AMCD April 2024 Denial – The Manager of the AMCD's April 10, 2024 letter denying Solondz's reconsideration request for a Special Issuance. [000038-000039] Solondz initiated appeal No. 24-1105 following this denial.

Authorization – When used in the context of the FAA or the Air Surgeon authorizing a special issuance of a medical certificate pursuant to 14 C.F.R. § 67.401, it has the same meaning as "Special Issuance" defined below. Solondz's Opening Brief attempts to use "Special Issuance," rather than "Authorization," for consistency and clarity purposes.

FAA – Respondent/Appellee Federal Aviation Administration.

Mirtazapine – Also known as "Remeron", is an antidepressant prescription medication.

Remeron – Also known as "mirtazapine", is an antidepressant prescription medication.

SNRI – Also known as "serotonin and norepinephrine reuptake inhibitors", are a classification of a type of antidepressants.

CORE/3526649.0002/193417506.1

<u>Solondz</u> – Petitioner/Appellant Michael Solondz.

<u>Special Issuance</u> – Also known as an "Authorization", is granted at the discretion of the Air Surgeon to a person who does not meet the requirements of an Unrestricted Medical Certificate for the specific class sought if the person can "show to the satisfaction of the Air Surgeon that the duties authorized by the class of medical certificate applied for can be performed without endangering public safety during the period in which the Authorization would be in force" pursuant to 14 C.F.R. § 67.401. Solondz's Opening Brief attempts to use "Special Issuance" rather than "Authorization" for consistency purposes.

<u>SSRI</u> – Also known as "selective reuptake inhibitors", are a classification of a type of antidepressants and are the type of antidepressant most commonly prescribed in the United States.

<u>Unrestricted Medical Certificate</u> – A certification provided by the FAA to an airman who meets the general medical standards for the particular class sought as set forth in subparts B (first-class airman), C (second-class airman), and D (third-class) of Part 67 of Title 14 of the Code of Federal Register.

CORE/3526649.0002/193417506.1

## STATEMENT OF JURISDICTION AND STANDING

This Court's jurisdiction is pursuant to 49 U.S.C. § 46110(a) because Petitioner Michael Solondz ("Solondz") petitions for review of the final agency order of Respondent Federal Aviation Administration ("FAA"), issued by the Federal Air Surgeon, Office of Aerospace Medicine ("Air Surgeon"), in a July 9, 2024 letter [000022-28] concerning the denial of Solondz's application for a medical certificate. *See also*, Fed. R. App. P. 15(a); D.C. Cir. R. 15.

Solondz timely filed the Petition for Review for **Case No. 24-1284** on August 26, 2024. 14 C.F.R. § 16.247(a) (60-day deadline to petition for judicial review).

Solondz timely filed the Petition For Review for **Case No. 24-1105** on May 2, 2024, which petition originally sought review of the April 10, 2024 letter decision issued by the Manager of the Aerospace Medical Certification Division, Civil Aerospace Medical Institute [000038-40]; *see* Underlying Decision, Case No. 24-1105, filed July 24, 2024.[1]

Solondz's standing is based on the fact that he was the applicant before the FAA, where he sought a medical certificate. Thus Petitioner has a substantial interest in the FAA's final agency order.

---

[1] After Solondz filed the first appeal and the FAA's counsel consulted with Solondz's counsel, on July 9, 2024, the FAA issued the operative final agency decision, in which it described the April 10, 2024 letter as "erroneously issued" (at page 5).

1

## PERTINENT STATUTES AND REGULATIONS

Full text of the relevant regulations is reproduced in the Joint Deferred Appendix.

- 14 C.F.R. pt. 67, subpt. B

- 14 C.F.R. § 67.401

- 14 C.F.R. § 67.409

## STATEMENT OF ISSUES PRESENTED

1.     Did the FAA act arbitrarily, capriciously, abuse its discretion, or otherwise act contrary to law by failing to properly consider Solondz's individualized medical treatment and records when it denied Solondz's request for a special issuance airman medical certificate pursuant to 14 C.F.R. § 67.401?

2.     Did the FAA act arbitrarily, capriciously, abuse its discretion, or otherwise act contrary to law when, through the Air Surgeon and the Manager of the FAA's Aerospace Medical Certification Division, it denied Solondz's request for a special issuance airman medical certificate pursuant to 14 C.F.R. § 67.401?

2

## STATEMENT OF THE CASE

### 1.     Background and Medical History

The mental health crisis in this country is well documented. Many individuals suffer from anxiety, depression, or other mental health conditions and often have to deal with these issues silently due to the historical societal stigma associated with them. Aviation professionals, such as pilots, are no different. They often deal with job and other life stressors that can negatively affect their mental health. In addition, because the FAA has regulatory oversight over certain aviation professionals, pilots who have a mental health diagnosis must go through a special FAA process to receive authority to resume their careers as pilots, which often requires a pilot to self-ground (i.e., stop flying) for periods exceeding one year's time, resulting in severe financial hardship. This is true even after they have successfully treated their underlying mental health condition through therapy, medication, or otherwise. Unfortunately, many of these pilots are subjected to a long and arbitrary process that ultimately results in pilots being denied the right to resume their careers. According to a February 7, 2024 letter sent to the FAA by forty-five members of Congress, including the Chairman of the Subcommittee on Aviation and Chairman of the Committee on Transportation and Infrastructure, the FAA apparently routinely subjects aviation professionals who have had a mental health diagnosis to long cumbersome and punitive certification processes.

CORE/3526649.0002/193417506.1

We are concerned about the Federal Aviation Administration's (FAA's) approach to ensuring aviation professionals can obtain mental health care in a timely and efficient manner. It is clear to us that talented aviation professionals—our constituents—often suffer in silence because of the fear that medical evaluation, diagnosis, or treatment, could potentially prolong their return to work, or even prevent them from pursuing their aviation careers.  Medical standards help ensure safety in the National Airspace System (NAS); however, they cannot be so cumbersome or potentially punitive as to prevent healthy aviation professionals from having the ability to work.  The timely development and implementation of policies, protocols, and screening methods that enable and encourage individuals to get the care they need is imperative.

. . .

However, the Agency's backlog of decisions and reviews for aviation professionals that have sought mental health care persists and continues to strain the Agency's resources.  Long medical clearance wait times are not only severely disruptive to an individual's career but may also be a contributing factor discouraging other aviation professionals from self-disclosing mental health conditions. Such issues have led to distrust, frustration, and uncertainty between the Agency and the aviation community and present formidable challenges to the future of the United States aviation.

To address these issues, the FAA must modernize its mental health protocols and foster an environment where aviation professionals feel supported to seek treatment.  As today's young adults are more apt to openly discuss their mental health, we must be careful not to alienate any future workforce by continuing with a culture of stigma and fear of termination or denial.

. . .

The United States aviation industry's perception of mental health must evolve, not only for the benefit of our workforce, but also to ensure public safety, both in the air and on the ground. We urge the FAA to take decisive actions to reduce the stigma around mental health care in aviation, make meaningful changes to remove barriers without

CORE/3526649.0002/193417506.1

jeopardizing safety standards, reduce aeromedical decision wait times, and ultimately strengthen trust with our aviation workforce.

Letter from Garret Graves, Chairman, Subcommittee on Aviation, Congress of the United States, *et al*., to Michael Whitaker, Administrator, FAA (Feb. 7, 2024) [000043-000045].

Unfortunately, Solondz's experience with the FAA is similar. Solondz was a licensed commercial airline pilot for approximately two decades. That all came to an end in 2018 after Solondz began experiencing anxiety as a result of the deaths of his father and father-in-law. Dr. Denison July 2021 Report (000200). Like many who experience mental health issues following traumatic life events, Solondz sought the assistance of medical professionals. *Id.*; Dr. Nelson Letter (000166). To cope with the anxiety he experienced from the passing of his father and father-in-law, Solondz participated in grief counseling and therapy and was prescribed various antidepressant medications, including Lexapro in 2018. Dr. Denison July 2021 Report (000200). However, Solondz stopped using Lexapro due to the negative side effects that he experienced. *Id.*

During this same time period, Solondz "self-grounded" pursuant to 14 C.F.R. § 61.53, meaning that he made the unilateral decision to stop flying while he sought medical treatment and he notified the FAA of this decision. LoRusso & LoRusso August 2021 Letter (000210). Solondz continued to participate in therapy and tried additional antidepressants prescribed by his medical professionals, including

5

antidepressants that the FAA has conditionally approved for use by airmen. Dr. Denison July 2021 Report (000202); L. Carlson Shaw December 2020 Letter (000164). However, like Lexapro, these other FAA-approved antidepressants proved ineffective and caused significant side effects for Solondz. *Id.* In October 2020, Solondz was prescribed a different antidepressant called mirtazapine ("Remeron"). *Id.*; L. Carlson Shaw December 2020 Letter (000164); Dr. Levitt January 2023 Report (000241). Remeron proved to be extremely effective for Solondz from the beginning of his use, with Solondz reporting that he "sleeps well, does not feel groggy, and does not struggle with unwanted anxiety." Dr. Denison July 2021 Report (000200); Dr. C. Denison January 2023 Report (000245).

In August 2021, following successful treatment of his anxiety, Solondz sought approval from the FAA to end the period of grounding and resume flying. Ramos Law March 2023 Letter (000266). In order to be authorized by the FAA to fly, like all airmen, Solondz was required to seek a medical certification from the FAA. The requirements that must be met to obtain an unrestricted medical certification depend upon the class of medical certification that is sought (e.g., first-class, second-class, or third-class), but they all commonly require that the airman has not been diagnosed with certain medical conditions, among other restrictions. *See* 14 C.F.R. pt. 67, subpts. B, C, D. If an airman does not meet the requirements necessary to obtain an unrestricted medical certification, at its discretion, the Air Surgeon may issue an

CORE/3526649.0002/193417506.1

Authorization for Special Issuance of a Medical Certification ("Special Issuance"),
if the airman can demonstrate that "duties authorized by the class of medical
certificate applied for can be performed without endangering public safety during
the period in which the [Special Issuance] would be in force." 14 C.F.R. § 67.401.

Because Solondz had been diagnosed with generalized anxiety and was taking
medication to treat the illness, he was no longer eligible for an "unrestricted medical
certificate."    As a result, Solondz made a request for a Special Issuance.
Unfortunately for Solondz, rather than supporting Solondz's decision to self-ground
and successfully seek medical treatment for his mental health conditions, the Air
Surgeon refused to grant Solondz a Special Issuance.  Over the course of nearly four
years, the FAA slow played Solondz's numerous requests for a Special Issuance and
when it did provide responses to those requests (generally after prompting from
Solondz's counsel), the FAA refused to grant the requests citing Solondz's use of
the "aeromedically unacceptable" Remeron.  In addition, the FAA routinely sought
additional records and information from Solondz related to his use of Remeron and
other alleged medical conditions, despite the fact that much of the requested
information had already been provided to the FAA or was otherwise irrelevant.  The
FAA also attempted to deflect attention away from the real reason for its denials—
Solondz's use of Remeron—by pointing to other pretextual medical conditions,
despite the fact that those medical conditions had long been resolved and the medical

7

records clearly demonstrated as much. After four years of unsuccessfully trying to satisfy the FAA's never-ending requests, Solondz was left with no choice but to pursue these consolidated appeals.

### 2.    Procedural History

On August 4, 2021, Solondz made his first request that the Air Surgeon grant a Special Issuance. Air Surgeon Denial, 000023; LoRusso & LoRusso August 2021 Letter (000209-000219). On September 28, 2021, the Manager of the FAA's Aerospace Medical Certification Division ("AMCD") denied Solondz's request due to his history of anxiety and sleep disturbance treated with Remeron. AMCD September 2021 Denial, 001154-001155. On October 19, 2021, Solondz, through counsel, sought reconsideration of the AMCD September 2021 denial. [Ramos Law October 2021 Letter, 000223-000227]

On January 18, 2022, Solondz submitted a new request for a Special Issuance. Air Surgeon Denial, 000024. On February 11, 2022, the Manager of the AMCD again denied Solondz's request due to his history of anxiety and sleep disturbance treated with Remeron. AMCD February 2022 Denial, 000806-000807. On March 31, 2022, Solondz, through counsel, responded and again sought reconsideration by the Air Surgeon of the prior AMCD September 2021 denial (which had previously been requested) and of the new AMCD February 2022 denial. Ramos Law March 2022 Letter, 000220. On July 8, 2022, the FAA again denied Solondz's request. Air

8

Surgeon July 2022 Denial, 000456. That denial stated, in part, that the "available medical evidence reveals an established medical history or clinical diagnosis of: generalized anxiety disorder; sleep disorder (insomnia); and use of a medication (Mirtazapine/Remeron) which is unacceptable for aeromedical certification purposes" and "[a]s long as your generalized anxiety disorder and sleep disorder (insomnia) are being treated with the medication mirtazapine (Remeron), we can offer you no encouragement for a favorable review of your application." *Id.* That denial also requested a number of additional medical records from Solondz "[i]f you and your physician decide to discontinue mirtazapine, after a minimum of 60 days off the medication[.]" *Id.* at 000457.

Given the FAA's continued focus on Solondz's use of Remeron as a basis for its denial of Solondz's request for a Special Issuance, Solondz asked his doctors who had evaluated him and issued prior medical reports concerning his anxiety and use of Remeron to reevaluate him and issue new reports. On February 17, 2023, after being reevaluated by numerous doctors, Solondz submitted a new request for a Special Issuance to the FAA. Air Surgeon Denial, 000025. As explained in more detail below, in support of his new request, on March 10, 2023, Solondz also submitted extensive medical records, including updated reports from his treating physicians that all indicate that his anxiety was in remission and his use of Remeron was not causing any negative side effects. Ramos Law March 2023 Letter, 000265-

9

000277.  On March 17, 2023, the Manager of the AMCD responded to Solondz's

February 17, 2023 request by simply stating that

> [d]ue to your history of the use of the medication Remeron, the FAA finds that additional information is necessary to determine whether you meet the medical standards set forth in 14 C.F.R. § 67.413(a), you are requested to provide the following information within 60 days for FAA review: A typed detailed report from your treating physician regarding your use of Remeron, to include date prescribed, history, dosage, frequency of use, diagnosis, and prognosis, ,and if no longer prescribed, the date of discontinuance.

AMCD March 2023 Denial, 000279-280.  The letter did not mention that this

requested information was previously provided to the FAA as part of the March 14,

2023 submission in support of Solondz's February 17, 2023 request.

On April 14, 2023, the Manager of the AMCD issued another letter in

response to Solondz's February 17, 2023 request, this time denying Solondz's

request for a Special Issuance.  AMCD April 2023 Denial, 000109-000110.  Like

the prior denials, this denial was based on Solondz's history of generalized anxiety

and use of Remeron, but for the first time also included reference to "Sleep Apnea

(OSA) treated with Continuous Positive Airway Pressure (CPAP)," and "Atrial

Fibrillation (A-Fib)."  *Id.*  However, it did not consider any of the extensive medical

records that Solondz previously provided.

On May 12, 2023, Solondz requested reconsideration of the Air Surgeon of

the AMCD April 14, 2023 denial.  Ramos Law May 2023 Letter, 000105-000106.

In response, on May 28, 2023, the Manager of the AMCD sent Solondz a letter

requesting additional information, some of which was contingent upon Solondz discontinuing the use of Remeron and others requested updated information such as eye exams. AMCD May 2023 Letter, 000101-000103. In response, Solondz provided additional medical information to the FAA. Air Surgeon Denial, at 000025-000026; Ramos Law June 2023 Letter, 000091; Ramos Law November 2023 Letter, 000088-00089. On November 12, 2023, still having received no substantive response from the Air Surgeon in response to Solondz's May 12, 2023 request for reconsideration, Solondz, through counsel, followed up and again sought reconsideration by the Air Surgeon. Ramos Law November 2023 Letter, 000088-000089.

On November 20, 2023, six months after that reconsideration request was made, the Manager of the AMCD sent another letter requesting additional medical information, including a current psychiatric evaluation, CPAP data covering the preceding 90 or more days, and, should Solondz discontinue the use of Remeron, clinical progress notes regarding the discontinuation. AMCD November 2023 Letter (000071-000072). In response, on December 19, 2023, Solondz, through counsel, again requested reconsideration by the Air Surgeon of the AMCD's April 14, 2023 denial. Ramos Law December 2023 Letter, 000059-000063. On February 19, 2024,

CORE/3526649.0002/193417506.1

Solondz, through counsel, made another request for reconsideration.  Ramos Law February 2024 Letter, 000041.[2]

On April 10, 2024, the Manager of the AMCD, not the Air Surgeon, issued a letter in response to Solondz's request for reconsideration made nearly a year before, in which the Manager of the AMCD denied Solondz's request for reconsideration ("AMCD April 2024 Denial").  *Id.*; Manager of the FAA's AMCD April 2024 Denial, 000038.  The denial letter was very short and simply states that it is due to "your history of Generalized Anxiety Disorder, Obstructive Sleep Apnea (OSA) treated with Continuous Positive Airway Pressure (CPAP), Atrial Fibrillation (A-Fib) along with the use of the aeromedically unacceptable medication Mirtazapine (Remeron)." *Id.*

On May 2, 2024, Solondz filed a Petition for Review with this Court seeking review of the AMCD April 2024 Denial ("First Petition").  Pet. For Review, Case No. 24-1105, Doc. No. 2052614.  Following Solondz's filing of the First Petition, the FAA indicated to Solondz's counsel that it was taking the position that the AMCD April 2024 Denial was not a final agency action and, therefore, not appealable, because it was not issued by the Air Surgeon.  Consent Mot. to Consolidate Appeals, Doc. No. 2072364, p. 2.  Solondz disagreed with the FAA's

---

[2] The letter contains a typographical error in the date as it is dated February 19, 2023, but it should have been February 19, 2024.

CORE/3526649.0002/193417506.1

position, in part, relying on *Friedman v. FAA*, 841 F.3d 537, 542-44 (D.C. Cir. 2016) (holding that petitioner's appeal was proper even where no "formal decision" had been rendered

by the FAA, because the FAA had clearly communicated its position on petitioner's request).  Nevertheless, Solondz agreed to work with the FAA to try to resolve the perceived procedural issues to avoid the cost of briefing the issues and delays in the case related to the same.  Consent to Mot. to Consolidate Appeals, Doc. No. 2072364, p. 3.  The parties agreed to extend the briefing deadlines to provide the Air Surgeon time to issue a second "final" decision.  *Id.*  Assuming the decision would be a denial, Solondz would then submit that decision as part of its submission to the Court as the underlying decision from which the appeal was being taken and the appeal would proceed.  *Id.* at pp. 3-4.  FAA's counsel then prepared and filed a Joint Motion to Extend Deadlines to File Initial Submissions by Fifty Days, which the Clerk granted.  *Id.* at 4.

On July 9, 2024, approximately a year and a half after Solondz submitted his most recent request to the FAA for a Special Issuance, the Air Surgeon issued a letter denying Solondz's request for reconsideration of the AMCD April 14, 2023 Denial ("Air Surgeon Denial").  Air Surgeon Denial, 000022-000028.  This denial was more detailed in many respects than the prior denials, likely because this matter was already pending before this Court.  Nevertheless, the Air Surgeon Denial was based

primarily on Solondz's continued use of Remeron.  *Id.* at 000026.  Although not mentioned in any of the prior denials, the Air Surgeon Denial for the first time also bases the denial on an alleged "optic neuritis" issue as well as a prior diagnosis for "malignant melanoma," both of which were previously treated as reflected in the very medical records cited by the Air Surgeon.  The Air Surgeon Denial also mentions Solondz's history of sleep apnea, but it is unclear whether that served as a basis for denial.  *Id.* at 000027-00028.

On August 26, 2024, Solondz filed a Petition for Review, seeking review of the Air Surgeon Denial ("Second Petition").  Second Petition, Case No. 24-1284, Doc. No. 2072109.  This Second Petition was filed after the FAA's counsel informed Solondz's counsel that the FAA believed that the First Petition may not be procedurally proper—despite the parties' prior agreement—since the Air Surgeon Denial had not yet been issued when the First Petition was filed.  Consent Mot. to Consolidate Appeals, Doc. No. 2072364, p. 5.  As such, out of an abundance of caution, Solondz filed the Second Petition and then filed a Consent Motion to Consolidate Appeals, requesting consolidation of Case No. 24-1284 and Case No. 24-1105 along with a combined briefing schedule.  *Id.*  On September 9, 2024, the Clerk entered an Order granting the Consent Motion to Consolidate and set a joint briefing schedule.  Order, Case No. 24-1105, Doc. No. 2073887.

CORE/3526649.0002/193417506.1

## SUMMARY OF ARGUMENT

The FAA acted improperly when it denied Solondz's request for a Special Issuance pursuant to 14 C.F.R. § 67.401. The FAA denied Solondz's request because he has a history of anxiety and was being treated (successfully) with an antidepressant medication, Remeron, that the FAA has arbitrarily deemed "aeromedically" disqualifying. In denying Solondz's request, the FAA failed and refused to consider, much less weigh, Solondz's individualized medical treatment and records in considering whether he could perform his airman job duties safely. These medical records undisputedly demonstrate that Solondz's anxiety was in remission and his use of Remeron was both effective and caused no side effects. Instead of considering this relevant information, the Air Surgeon relied on general studies and other information about Remeron that have found that it can cause some who take the medication to feel drowsy, despite the fact that (i) Solondz's medical records, which include multiple cognitive screening exams, demonstrate that he experiences no negative side effects and (ii) the FAA has conditionally authorized other similar antidepressant medications that the FAA admits can also cause drowsiness, but unlike in Solondz's case with his use of Remeron, in those situations, the FAA evaluates them on a case-by-case basis. In an effort to try to strengthen its denial, the FAA also added a series of other pretextual reasons for its denial by pointing to certain other medical conditions that the FAA then speculates about a

15

parade of horribles that the FAA alleges could occur, despite the medical records refuting these improper speculations.

**ARGUMENT** [3]

## I.    Applicable Regulations and Standard of Review

These consolidated appeals arise from the FAA's denial of Solondz's request for a Special Issuance pursuant to 14 C.F.R. § 67.401, which provides, in part, that

> At the discretion of the Federal Air Surgeon, an Authorization for Special Issuance of a Medical Certificate (Authorization), valid for a specified period, may be granted to a person who does not meet the provisions of subparts B, C, or D of this part if the person shows to the satisfaction of the Federal Air Surgeon that the duties authorized by the class of medical certificate applied for can be performed without endangering public safety during the period in which the Authorization would be in force.

14 C.F.R. § 67.401(a). The regulation goes on to state that

> In granting an Authorization or SODA, the Federal Air Surgeon may consider the person's operational experience and any medical facts that may affect the ability of the person to perform airman duties including –
>
> (1) The combined effect on the person of failure to meet more than one requirement of this part; and
>
> (2) The prognosis derived from professional consideration of all available information regarding the person.

---

[3] This is a consolidated appeal of two appeals arising from two separate FAA decisions denying Solondz's request for a Special Issuance. *See* Air Surgeon Denial, 000022-000028; AMCD April 2024 Denial, 000038-000039. These appeals involve essentially the same issues. For the sake of simplicity, Solondz's Argument section focuses on, and primarily cites to, the Air Surgeon's Denial, although the substantive arguments are the same in response to the AMCD's April 2024 Denial.

16

14 C.F.R. § 67.401(c). "While these directives are clearly open to interpretation, they nonetheless provide a judicially manageable standard." *Friedman v. FAA*, 841 F.3d 537, 544 (D.C. Cir. 2016).

This Court "'may overturn nonfactual aspects of the FAA's decision only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" *Erwin v. FAA*, 23 F.4th 999, 1006 (D.C. Cir. 2022) (quoting *Boca Airport, Inc. v. FAA*, 389 F.3d 185, 189 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A))); *see also id.* ("'The FAA's factual determinations are conclusive if they are supported by substantial evidence.'") (quoting *City of Santa Monica v. FAA*, 631 F.3d 550, 554 (D.C. Cir. 2011) (citing 49 U.S.C. § 46110(c))). The Court "may not 'substitute [its] judgment for that of the agency.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 103 S.Ct. 2856, 2860 (1983)). The Court's "role is to determine whether the FAA has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action' that does not 'fail[] to consider an important aspect of the problem,' 'run[] counter to the evidence' or is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* at 161. However, the Court may not "'supply a reasoned basis for the agency's action that the agency itself has not given.'" *Id.* Moreover, the Court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority, as the

17

[Administrative Procedure Act] requires." *Loper Bright Enter. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024).

The FAA has long operated under an assumed authority, derived from a presumed delegation by Congress, to issue an Airman Medical Certificate. Such authority was birthed from a marriage of ambiguity and deference. Recently, however, the Supreme Court held, "statutory ambiguity, as we have explained, is not a reliable indicator of actual delegation of discretionary authority to agencies." *Id.* at 2272.

The Air Commerce Act of 1926 was the first of its kind to grant powers to the Secretary of Commerce to foster air commerce. Air Commerce Act of 1926, Pub. L. No. 69-254, 44 Stat. 568. Among the powers vested, the Secretary of Commerce was instructed to "provide for the periodic examination and rating of an airman serving in connection with aircraft of the United States as to their qualifications for such service." *Id.* § 3(c). As aviation evolved, Congress revised these powers through the Civil Aeronautics Act of 1938. The amended powers granted the newly formed Civil Aeronautics Authority ("CAA") the ability to "issue airman certificates specifying the capacity in which the holders thereof are authorized to serve as airman in connection with aircraft." Civil Aeronautics Act of 1938, Pub. L. No. 75-706, § 602(a), 52 Stat. 973. Furthermore, the Act permitted the CAA to issue a certificate if, after investigation, it finds the person to be "physically able to perform the duties

18

pertaining to, the position for which the airman certificate is sought." *Id.* § 602(b). The certificate itself was required to be numbered, to state the name and address of the airman, to contain the designated class of the certificate, and, for those airmen serving in scheduled air transportation, to be designated "'airline transport pilot.'" *Id.* § 602(c). These requirements are fulfilled by and through an Airman Certificate, otherwise commonly known as a pilot's license.

The FAA, as known today, was established by the Federal Aviation Act of 1958.  Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731. The powers given to the CAA with regard to airman certification were extended, verbatim, to the newly formed FAA.  *Compare id.* § 602(a), *with* Civil Aeronautics Act of 1938, Pub. L. No. 75-706, § 602(a), 52 Stat. 973. Since 1958, those delegated powers have remained unchanged; however, the FAA has expanded its self-derived authority to include the ability to grant, police, and enforce a second airman certificate, in the form of an Airman Medical Certificate. The unequivocal direction Congress provided with regard to an Airman Certificate simply does not exist for an Airman Medical Certificate.  Therefore, the FAA, through ambiguity and now-discredited doctrines of agency deference, created and governs Airman Medical Certifications under the no-longer-protected veil of discretionary authority. *See Loper*, 144 S. Ct. at 2272.

CORE/3526649.0002/193417506.1

That said, the issues presented in this appeal by Solondz do not necessarily require this Court to reject the FAA's authority with respect to Airman Medical Certificates. However, in light of *Loper*, this Court should review with greater skepticism and less deference both the FAA's actions here, and the pre-*Loper* case law the FAA will cite in opposition to this petition.

## II. The FAA abused its discretion, acted arbitrarily, capriciously, and contrary to law when it denied Solondz's request for a Special Issuance based on his use of Remeron.

### 1. The FAA failed to consider, much less weigh, Solondz's individual medical records concerning his use of Remeron when it denied his request for a Special Issuance, in contravention with 14 C.F.R. § 67.401.

In support for his request for a Special Issuance, Solondz submitted numerous medical records reflecting numerous medical professionals' evaluations of him in connection with his use of Remeron. Although the Air Surgeon acknowledged in its denial that the FAA had been provided these medical records (Air Surgeon Denial, 000023-000024), the Air Surgeon failed to consider any of these records. This failure is contrary to 14 C.F.R. § 67.401 and is arbitrary and capricious. *Erwin*, 23 F.4th 999, 1007 (D.C. Cir. 2022) ("The FAA acted arbitrarily and capriciously by failing to weigh the evidence provided with Erwin's reconsideration request.").

The FAA's failure to consider Solondz's medical records is similar to the FAA's failure in *Erwin*. In *Erwin*, the airman, Charles Erwin, had previously been issued a Special Issuance medical certification based on his history of alcohol

dependence. *Id.* at 1002-03. That Special Issuance medical certification contained certain restrictions, including that Erwin abstain from alcohol. *Id.* at 1003. The day after Erwin ate food at a restaurant that had been cooked in beer (unbeknownst to Erwin), he was subject to a random and FAA required alcohol test, which he failed. *Id.* As a result, the FAA withdrew his Special Issuance medical certificate. *Id.* Erwin sought reconsideration of that decision by the Air Surgeon. *Id.* Erwin submitted to the FAA various evidence in support of his reconsideration request, including a report from a forensic toxicologist and other medical reports and documents, to support his argument that the failed alcohol test was a result of food cooked in beer and not a result of him knowingly consuming alcohol. *Id.* The FAA initially did not act upon Erwin's reconsideration request and, instead, issued him a new Special Issuance medical certification that contained additional restrictions. *Id.* at 1004.

The Air Surgeon then issued a decision denying Erwin's request for reconsideration of the withdrawal of his first Special Issuance medical certification. *Id.* The Air Surgeon acknowledged receipt of the various evidence and medical records provided by Erwin, but simply concluded that "'the additional information and documentation is not sufficient to reverse' the withdrawal" and, thus, affirmed the decision to withdraw. *Id.* On appeal to this Court, Erwin argued that the FAA's denial should be set aside, because the FAA failed to explain how a single inadvertent exposure to alcohol "'overcame all other documentation that supported

[his] contention that he had an accidental, extraneous ethanol exposure,'" that the FAA failed to "mention 'what documentation was reviewed, weighed, or assigned credibility,'" or why it "'ignored'" the medical records provided that concluded "that Erwin's positive test was 'inadvertent and secondary to his ingestion of food prepared with beer.'" *Id.* at 1006 (internal citations omitted). In response, the FAA argued that it could rely "solely on the positive test and Erwin's history of alcohol dependence" and ignore Erwin's other evidence. *Id.* at 1007. In agreeing with Erwin, this Court held that

> In our view, Erwin's reconsideration request and accompanying evidence, set out *supra* at 1003, merits the FAA's *explicit* consideration. Its Final Order does not do so. And the FAA is a repeat offender. As we have previously told the agency, it "cannot simply declare its 'expertise'; it must exercise that expertise and demonstrate sufficiently that it has done so else we have nothing to review much less defer to." *Village of Bensenville v. FAA*, 376 F.3d 1114, 1122 (D.C. Cir. 2004) (internal footnote omitted).
>
> The FAA acted arbitrarily and capriciously by failing to weigh the evidence provided with Erwin's reconsideration request. *See Pub. Citizen Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result.").

*Id.* at 1007 (emphasis original).

Like in *Erwin*, the FAA failed to consider, much less weigh the medical and other evidence provided by Solondz in support of his reconsideration request. Here, however, the FAA's failure is actually more egregious. In *Erwin*, there was evidence (and even an admission by Erwin) that he had been exposed to alcohol and failed a

CORE/3526649.0002/193417506.1

test in violation of the restrictions for his Special Issuance. *Id.* at 1003. Notwithstanding that, this Court still held that the FAA was required to "explicitly" consider and weigh the contrary evidence, including medical records, submitted by Erwin, that supported his position. Here, as set forth more thoroughly below, the **only** evidence in the record about Solondz's personal use of Remeron demonstrates that he has no negative side effects and it is effective in treating his underlying medical conditions. The FAA completely ignored this evidence.

The need to consider Solondz's individual medical records is further demonstrated by the fact that the Air Surgeon is supposed to consider whether Solondz was able to perform his job duties safely. Specifically, 14 C.F.R. § 67.401(a) states that a person may be granted a Special Issuance "if the person shows to the satisfaction of the Federal Air Surgeon that the duties authorized by the class of medical certificate applied for can be performed without endangering public safety during the period in which the Authorization would be in force." This necessarily requires that the Air Surgeon consider not only the medical evidence presented (as discussed above), but also weigh and consider that evidence in connection with determining whether the person can perform their duties "without endangering public safety." *Id.* § 67.401(a). Otherwise, if the Air Surgeon is simply able to ignore the specific medical evidence provided in determining whether public safety was a legitimate concern, as she did here, then the Special Issuance process

23

would essentially be meaningless. That is, the Special Issuance process exists because the applicant necessarily has an underlying medical condition that otherwise prevents them from obtaining an Unrestricted Medical Certificate. 14 C.F.R. § 67.401(a). If the Air Surgeon never considered a Special Issuance applicant's medical records or weighed them in assessing whether the applicant could perform their duties safely, then presumably no one could ever be provided a Special Issuance, because the Air Surgeon would be able to point to the underlying health condition or treatment that prevented the applicant from being eligible for an Unrestricted Medical Certificate and deny the Special Issuance for the same reason.

> ### 2. The FAA arbitrarily refused to consider Solondz's individual medical records despite conducting case-by-case reviews for airmen who use similar medications.

"'[F]oolish consistency' may be the 'hobgoblin of little minds,' but consistency—whether foolish or not—is a well-rooted concept in APA jurisprudence. '"A long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently."'" *Kort v. Burwell*, 209 F.Supp.3d 98, 111-12 (D.D.C. 2016) (quoting *City of Los Angeles*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)). The FAA admits that it does conduct Special Issuance application analysis on a more individualized and case-by-case basis, at least when it relates to other similar antidepressant medications. In the Air Surgeon Denial, the FAA acknowledges that it recently

approved two new medications that are used to treat anxiety and depression that, according to the FAA, have "a much lower risk of somnolence or sedation than does Remeron (mirtazapine), and after detailed review by the FAA it is determined that Special Issuance may be considered on a case-by-case basis for individuals being treated with these medications." [Air Surgeon Denial, 000027] As acknowledged by the FAA, these two newly approved medications are not reported to have *no* risk of somnolence, only apparently a "lower risk of somnolence or sedation than does Remeron (mirtazapine)[.]" *Id.* That is likely why the FAA has not approved them without restriction, but instead has "conditionally approved" the medications "on a case by case basis[.]" *Id.* Presumably, as part of this "case-by-case" assessment, the FAA considers the individual's medical records—and whether the medication is causing somnolence in that specific individual—in determining whether the individual can take those two new medications without causing safety concerns. If that were not the case, then the FAA would have no way to determine whether applicants taking these new medications are safe to perform their flight responsibilities. Stated differently, the FAA apparently does not have a "no drowsiness" policy when it comes to antidepressant medications; instead, for some medications that are known to cause drowsiness, the FAA will evaluate pilots taking those medications to determine whether they are safe to fly, but when it comes to Remeron, the FAA summarily and arbitrarily denies those pilots' requests for a

CORE/3526649.0002/193417506.1

Special Issuance. *Kort*, 209 F.Supp.3d at 112 ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.") (internal quotations and citations omitted.).

Solondz was entitled to the same case-by-case assessment that the FAA employs for similar medications.

> We note that the FAA has shown an increased willingness in recent years to issue "special" medical certificates under section 67.19 of the regulations (the functional equivalent of a second exemption mechanism) to pilots otherwise disqualified by episodes of heart disease or alcoholism. *See* 14 C.F.R. §§ 67.13, .19 (1988). Part of the rationale for a statutory exemption procedure, no doubt, is to allow the FAA flexibility in the application of its rules; this flexibility arguably entails authority to determine that some rules can be relaxed more freely than others. *See Starr*, 589 F.2d at 313. The statutory justifications for these distinctions, however, should be just as susceptible to rational explanation as the bases for any other agency decision.

*Aman v. FAA*, 856 F.2d 946, 957 (7th Cir. 1988).  There is simply no rational basis, and the FAA has provided none, to "conditionally approve" certain medications and conduct a "case-by-case" assessment for pilots who take those medications while summarily denying pilots who take Remeron, when both types of medications have been shown to cause similar side effects.  *See Kort*, 209 F.Supp.3d at 113-16 (finding agency acting approving certain medical scans for coverage while denying other similarly situated scans was arbitrary and capricious); *McHenry v. Bond*, 668 F.2d

1185, 1192-94 (11th Cir. 1982) (reversing agency decision as arbitrary and capricious and noting that "the requirements that an agency explain its departure from precedent, and adequately explain the rationale of its decision, are prerequisites to a judicial finding that an agency's action is not arbitrary and capricious").

### 3. Solondz's uncontroverted medical records establish that the way Solondz self-administered Remeron (a) was effective in treating the underlying medical issues and (b) did not cause a safety concern for anything on the ground or in the air.

Every medical record related to Solondz's use of Remeron demonstrates that his use of the medication was both effective and caused no side effects. The FAA has not, nor could it, refute any of these findings.

Since late 2020, Solondz has been evaluated by no less than four medical professionals, all of whom have seen him multiple times since 2020 and all reported positive results based upon Solondz's use of Remeron. *See, e.g.,* L. Carlson Shaw, December 2020 Letter (000164); Dr. Nelson January 2021 Letter (000166); Dr. Denison July 2021 Report (000199-205); Dr. Levitt July 2021 Report (001161-66); Dr. Denison January 2023 Report (000243-247); Dr. Levitt January 2023 Report (000240-41).

In December 2020, Linda Carlson Shaw, who is a clinical nurse specialist and nurse practitioner, and is the medical professional who first prescribed Remeron to Solondz, reported that Solondz had "reported that he was doing well on Remeron 45mg. one tablet at night for sleep. Additionally, he reports no depression or anxiety

CORE/3526649.0002/193417506.1

on this dose" and that Remeron has "given [Solondz] NO SIDE EFFECTS, and has proved to be highly effective in remission of all of his symptoms." L. Carlson Shaw December 2020 Letter (000164) (emphasis original).

Similarly, in January 2021, Dr. Alan Nelson, a licensed psychiatrist, provided a summary of his findings based on seven separate evaluations of Solondz spanning from September 2020 to January 2021. Dr. Nelson reported that Solondz "has responded well to this medication and can feel its effectiveness in clarity of thought" and "I see the medication as very helpful without any cognitive impairment or significant side effects." Dr. Nelson January 2021 Letter (000166).

On July 6, 2021, Dr. Chuck Denison issued a report based on an "aeromedical psychological examination" of Solondz that was conducted on May 25 and July 6, 2021. Dr. C. Denison July 2021 Report (000199-000205). Dr. Denison is a licensed psychologist with over twenty years of experience in his "specialty areas of forensic psychology, aviation psychology, and neuro psychological assessment." *Id.* at 000201. His practice "consists primarily of psychological evaluation and testing (including neurocognitive, substance abuse, fitness for duty and personality assessment)." *Id.* His "practice in aviation psychology includes yearly attendance at the HIMS (Human Intervention and Motivation Study) Program training" and he attends "the Aeromedical Psychology Seminar each year for continued training in aviation neuropsychology." *Id.* He is also trained and experienced "in the use of

28

the CogScreen-AE and other neuropsychological test measures pertinent to evaluation of pilots, flight engineers, flight medics and air traffic controllers." *Id.* Given his training and experience, he is also "eligible for board certification in both neuropsychology and forensic psychology, thus meeting all FAA requirements for services in the HIMS program and the full range of aeromedical psychology services." *Id.* at 000201-202.

Dr. Denison's report sets forth the procedure he undertook for his evaluation of Solondz:

> the medication mirtazapine [Remeron] is not among the four anti-depressant medications used in the FAA's SSRI Decision Path II consideration. In this case, the request is that Mr. Solondz have a neurocognitive screening to help determine whether mirtazapine has any untoward effects on his neurocognitive domains. In an effort to make that determination I have administered Session #1 of the CogScreen-AE test."

*Id.* at 000200. A "CogScreen is a neurocognitive screening instrument consisting of a variety of separate subsets. It is computer administered and scored by a HIMS-trained aviation/neuropsychologist" and the "test is designed to measure memory, deductive reasoning, visuospatial, motor coordination and related areas of functioning." *Id.* at 000203. "The CogScreen is interpreted using norms specific to the pilot population, and further specified to a range of pilot population, and further specified to a range of pilots and ages of Major US Airlines to General Aviation airmen." *Id.*

29

In conducting his evaluation, Dr. Denison used the same protocol he "would use for an SSRI Decision II Initial evaluation." *Id.* at 000200. The FAA SSRI Decision II protocol is a guide for aviation medical examiners when dealing with an airman who is using an FAA-approved SSRI antidepressant and it sets forth the decision process the FAA utilizes to determine whether to approve that airman's request for Special Issuance. FAA Guide for Aviation Medical Examiners (001725). SSRIs, or selective serotonin reuptake inhibitors, are a classification of a type of antidepressants and are the type most commonly prescribed. At the time of Dr. Denison's report, all of the FAA's conditionally approved antidepressants were SSRIs.[4] L. Carlson Shaw December 2020 Letter (000164). Remeron, on the hand, while also an antidepressant, does not fall within the classification as an SSRI. *Id.* As a result, the FAA does not have a "protocol" for approving an airman who is using an antidepressant other than those it has conditionally approved. Nevertheless, Dr. Denison used this same FAA protocol to assess whether Solondz was otherwise eligible for a Special Issuance.[5] The FAA SSRI Decision II protocol is as follows:

---

[4] This includes Fluoxetine (Prozac), Escitalopram (Lexapro), Sertraline (Zoloft), and Citalopram (Celexa). L. Carlson Shaw December 2020 Letter (000164); FAA Guide for Aviation Medical Examiners (001725). The FAA later conditionally approved additional antidepressants that fall within the classification of SNRI and are subject to the same Decision II Initial evaluation. Air Surgeon Denial, 000027.

[5] Dr. Denison had to use the protocol with the assumption that Remeron was on the list of conditionally-approved medications and, therefore, followed the remaining steps in the protocol for his evaluation of Solondz.

30



*Id.*

Dr. Denison's report states that "Mr. Solondz reports that he now sleeps well, usually seven hours during the night, and has no negative effects (such as feeling sedated) from Remeron in the morning. His anxiety is so minimal that he rarely even thinks about the fact that he has a history of clinical anxiety." *Id.* at 000202. The CogScreen revealed no cognitive issues, with Dr. Denison noting that there was no "brain dysfunction" and the "CogScreen is within normal limits[.]" *Id.* at 000204. "This evaluation is aeromedically significant insofar as the applicant has a history of anxiety with sleep disturbance. However, the condition is being treated effectively. Regarding Mr. Solondz'[s] neurocognitive functioning—measured here through the CogScreen-AE—the findings are NOT aeromedically significant and

CORE/3526649.0002/193417506.1

the airman's performance is quite strong." *Id.* at 0000205 (emphasis original). Thus, using the FAA's own protocol, Dr. Denison concluded that there was no "aeromedically significant" findings related to Solondz's use of Remeron. Except for the fact that Solondz was using an antidepressant that the FAA arbitrarily excludes from its short list of approved antidepressants, Solondz otherwise satisfied the remaining requirements of the protocol such that he met eligibility for a Special Issuance.

On July 19, 2021, Dr. Gwen Levitt, a Distinguished Fellow of the American Psychiatric Association and an FAA authorized psychiatrist, issued her first report on Solondz based on an evaluation on March 11, 2021. Dr. Levitt July 2021 Report (001161-001166). Dr. Levitt noted that Solondz's generalized anxiety disorder and insomnia were both "in remission." *Id.* at 001165. Dr. Levitt further noted that Solondz's "neuropsychological testing was normal, and no aeromedical concerns were identified. These tests were performed while Capt. Solondz was taking Remeron. This demonstrates that his use of Remeron is not impacting his cognitive performance. He appears to be in full remission currently." *Id.* at 001166.

On January 17, 2023, Dr. Denison issued another report after conducting a follow-up examination of Solondz that day. Dr. Denison January 2023 Report (000243-000247). Dr. Denison conducted a new CogScreen of Solondz and utilized the same FAA SSRI Decision Path II protocol for his evaluation of Solondz during

32

this evaluation as he used for his first evaluation in 2021. *Id.* As noted in Dr. Denison's report, Solondz reported to Dr. Denison that he (Solondz) "continues to use the antidepressant Remeron (mirtazapine) with favorable results. Specifically, he states that he has now been on the same medication for about two years, and continues to experience normal cognitive, behavioral and emotional functioning. He has no problems with anxiety management since he has started using the medication." *Id.* at 000244. Dr. Denison noted that Solondz "has had excellent results with Remeron virtually from the beginning. He sleeps well, does not feel groggy, and does not struggle with unwanted anxiety." *Id.* at 000245. As for the results of the CogScreen, Dr. Denison stated that "[t]his CogScreen-AE2 profile is considered an ideal performance. There are no identified weaknesses or indications of cognitive deficits." *Id.* at 000246. Dr. Denison concluded that "[o]nce again, the airman's CogScreen performance is wholly within normal limits. This evaluation is aeromedically significant insofar as the applicant has a history of anxiety with sleep disturbance. However, the condition now shows a multi-year history of being treated effectively with Remeron. Regarding Captain Solondz'[s] neurocognitive functioning—measured through the CogScreen-AE2—the findings are NOT aeromedically significant." *Id.* at 000247.

On January 24, 2023, Dr. Levitt issued her second report following a November 29, 2022 evaluation. Dr. Levitt January 24, 2023 Report (000240-

000241).  Dr. Levitt's report notes that Solondz denied having any "depression or manic like symptoms, anxiety or panic. He reported no issues with his appetite, memory, or concentration." *Id.* at 000241. Dr. Levitt's report further notes that Solondz's generalized anxiety disorder and insomnia were both in remission. She concludes that "[h]is [p]ast and current neuropsychological testing was normal, and no aeromedical concerns were [i]dentified. These tests were performed while Capt. Solondz was taking Remeron. This demonstrates that his use [of] Remeron is not impacting his cognitive performance. He appears to be in full remission currently." *Id.*

As set forth above, numerous highly trained medical professionals evaluated Solondz over the course of numerous years, while he was taking Remeron, and every one of them concluded that Solondz's use of Remeron was effective in treating his underlying anxiety and sleep disturbances and none of them found that Solondz experienced any negative side effects. Further, none of the reports suggest that Solondz's use of Remeron is a cause for any safety concern nor do they suggest that he would be unable to safely perform his job duties. Indeed, they universally conclude the opposite. Despite these findings, the FAA improperly failed to consider this evidence.

**III.    The FAA's reliance on the Food and Drug Administration's ("FDA") prescribing information and a single generalized study for the proposition that use of Remeron may cause somnolence in some patients**

**who use the drug is insufficient to support its denial of Solondz's request for a Special Issuance.**

In denying Solondz's Special Issuance request, the Air Surgeon relied on the FDA's prescribing information that references a study in which approximately half of the patients who took Remeron reported experiencing somnolence and to a study that essentially finds the same thing in order to conclude that "[g]iven the available evidence and my duty to ensure aviation safety, I am unable to conclude that the likelihood of sedation that is known to occur with mirtazapine is sufficiently low to assure safety while operating an aircraft in the national airspace." Air Surgeon Denial, 000026-000027. The FAA's reliance on the FDA's prescribing information and a single study does not overcome its failure to consider and weigh Solondz's individual medical records.

### 1. The FAA's position creates an arbitrary and capricious blacklist against the use of Remeron, simply because there are reported instances of somnolence in some patients who take it.

The fact that the FDA reported that somnolence occurred in approximately half of the patients treated for depression with Remeron also means that approximately half (like Solondz) who were treated did not report experiencing any somnolence or other negative side effects. In other words, approximately half of the patients who use Remeron do not experience the very side effect that the FAA points to as being the basis for denying Solondz's request. As a result, because Remeron apparently does not cause the same somnolence side effect for all patients who take

35

the medication, this data supports the need for the FAA to conduct an individualized and case-by-case assessment of the available medical information to determine how Remeron affects Solondz personally. The FAA failed to consider that information. As discussed above, Solondz's undisputed medical records demonstrate that he has not experienced negative side effects.

Further, the FAA's position is not—nor could it be—that in order for the FAA to approve a Special Issuance, the pilot must be taking medication that has a zero percent chance of causing somnolence (or no reported instances of such a side effect). Indeed, the FAA admits that it recently approved medications for the treatment of anxiety and depression that are known to cause somnolence in certain patients who take those medications:

> As of April 24th, 2024 we have also conditionally approved: bupropion slow release and extended release formulations, desvenlafaxine, duloxetine and venlafaxine. These medications are reported to have a much lower risk of somnolence or sedation than does Remeron (mirtazapine), and after detailed review by the FAA it is determined that Special Issuance may be considered on a case by case basis for individuals being treated with these medications.

Air Surgeon Denial, 000027. The fact that these two newly approved medications allegedly have a "lower risk of somnolence or sedation than does Remeron" is not a valid justification for the FAA's position, but only serves to underscore the arbitrariness of it. That is, all three of these medications—Remeron and the two newly approved medications—all reportedly can cause somnolence in at least some

36

patients. However, the FAA arbitrarily will consider "on a case-by-case basis" for Special Issuance pilots who take the two newly approved medications but will not provide the same level of review and consideration for those pilots, like Solondz, who treat with Remeron. It is arbitrary and capricious for the FAA to essentially blacklist Remeron and refuse to evaluate airmen taking that medication on a case-by-case basis (as it does with similar medication), simply because it has reportedly caused somnolence in some of the patients who take it, just as the other medications that the FAA has authorized have been shown to do.  Simply put, had the FAA conducted the individualized case-by-case assessment of Solondz's medical records, as it purportedly does for similar medications, the only conclusion that it could have come to was that Solondz was entitled to a Special Issuance.  That may suggest why the FAA simply refused to even consider them.

**2.    The FAA's reliance on a 1998 study is similarly misplaced.**

The FAA also relied on a 1998 study by J.G. Ramaekers, J.F. O'Hanlon, et al., which assessed study participants' driving performance while using of Remeron as well as another medication ("Ramaekers Study").  Air Surgeon Denial, 000026-000027; *see also* 001752 (Ramaekers Study).  The FAA's reliance on this study is misplaced for several reasons.

First, as mentioned above, the fact that somnolence may be a side effect for some patients who take the medication is essentially irrelevant (as is their relative

driving abilities related to experiencing somnolence), because the FAA failed to assess whether any such side effects presented with Solondz's use of the medication, utilizing the same case-by-case assessment that the FAA utilizes for similar medications. Second, the Ramaekers Study does not even conclude, as suggested by the FAA, that participants had "poorer performance with keeping land position after 16 days of treatment." *Id.* at 000026-000027. In fact, what the study found, among other things, was that "neither drug's effects on driving performance in this study were of sufficient magnitude to reduce the safety of vehicle operation." Ramaekers Study, 001759. In addition, and importantly, the study also found that Remeron's "sedating effects on daytime performance are much alleviated by nocturnal administrating. Presumably, this is the reason why mirtazapine is currently recommended to be taken in single evening doses . . . In our opinion, nocturnal dosing should be recommended for both drugs. This would not only promote safety over days, it would also utilize their sleep-inducing properties for avoiding the occasional necessity for hypnotic coadministration." *Id.* at 001761. Solondz self-administers Remeron at night, prior to going to bed, exactly as suggested by this study. L. Carlson Shaw December 2020 Letter (000164). Third, Dr. Levitt reviewed this study and noted "that long-term use and nocturnal dosing does not significantly impact driving. It is also known that low-dose mirtazapine is more sedating than at higher does due to histaminic receptor binding at the lower

dosage." Dr. Levitt July 2021 Report (001166). The Ramaekers Study and its conclusions did not change Dr. Levitt's conclusions in either of her reports that Solondz's use of Remeron did not cause somnolence. *See* Dr. Levitt July 2021 Report (001164, 001166) (noting that Solondz's wakes up in the morning, does not feel drowsy, and there were no aeromedical concerns related to his use of Remeron); Dr. Levitt January 24, 2023 Report (000241) (noting no aeromedical concerns identified).

Had the FAA properly considered and weighed Solondz's medical records and provided him the proper "case-by-case" assessment that the FAA provides similarly situated Special Issuance applicants, the only conclusion that the FAA could have reasonably came to was that Solondz could perform his job duties safely and was entitled to a Special Issuance.

## IV. The FAA's pretextual references to other medical issues are an abuse of discretion, arbitrary, capricious, and contrary to law.

The FAA's denial of Solondz's Special Issuance has been, and always was, because the FAA improperly blacklisted Remeron. When faced with the prospect of defending its arbitrary and capricious denial, the FAA opted to create a new, unusually long denial letter in which it pretextually added several additional grounds for denial. [*Compare*, Air Surgeon Denial [000022-28], *with* AMCD April 2024 Denial [000038-40]] Scouring Solondz's medical records, the FAA honed in on four potential conditions—one resolved for decades—as additional pretext: Optic

39

neuritis; malignant melanoma; atrial fibrillation; and sleep apnea. None of these serves as a proper basis for denying the Special Issuance.

**1. Solondz previously disclosed the optic neuritis and malignant melanoma issues, and the FAA never previously relied on these issues as the basis for a denial.**

In the Air Surgeon Denial, the FAA incorrectly claims that Solondz did "not report[] in [his] medical certificate application" issues related to optic neuritis and malignant melanoma.[6] [000024] The FAA then cites both as additional rationales for denying the Special Issuance. [000027] The pretextual nature of these rationales is underscored by the fact that Solondz had previously disclosed this information to the FAA—a fact the FAA readily admitted.

First, as the Air Surgeon Denial points out, Solondz provided information concerning optic neuritis and malignant melanoma to the FAA in 2022 **before** the FAA ever asked for such information. [000024-25 (referring to prior July 8, 2022 denial which discussed Solondz's disclosure of optic neuritis and malignant melanoma)] The Air Surgeon Denial notes that the March 11, 2021 psychiatric report by Dr. Levitt (on pages 4 and 5) that Solondz provided references optic

---

[6] In adding these other medical issues as "bases" for its denial of Solondz's request, the Air Surgeon Denial suggests that Solondz failed to truthfully disclose these medical conditions. Air Surgeon Denial, 000028. This accusation is unfounded and is a transparent attempt by the FAA to cast dispersions upon Solondz to deflect from the relevant issue of whether the FAA properly denied Solondz's request. The reality is that Solondz did disclose these medical conditions and provided numerous medical records related to them, which is exactly how the FAA knows about them.

neuritis. [000457-458] It also points out that, on October 19, 2021, Solondz submitted a report from Dr. Denison dated July 6, 2021, which discusses both the optic neuritis and the malignant melanoma. [000457] The Air Surgeon Denial also acknowledges that in April 2023, after submitting his most recent application for medical certification on February 17, 2023, Solondz provided the FAA with additional medical information about both the optic neuritis and malignant melanoma. [000025]

Second, despite Solondz disclosing these conditions, they did not previously serve as a basis for denial. Despite the FAA's suggestion otherwise, the agency has possessed the relevant information in Solondz's medical file concerning both optic neuritis and malignant melanoma for over three years. This includes during all of the relevant denials that led to this petition. Only after Solondz filed the First Petition did the FAA include these two former medical conditions as a purported basis for denying the Special Issuance. The FAA's prior choice to omit those conditions from its rationales speaks volumes about their actual importance.

- The express bases for the FAA's previous July 8, 2022 denial were "generalized anxiety disorder; sleep disorder (insomnia); and use of medication (Mirtzapine/Remeron) which is unacceptable for aeromedical certification purposes." [000456]

41

- On July 27, 2022, the FAA responded to a letter from Senator John Hickenlooper (CO), who had inquired about Solondz's request for a Special Issuance. The FAA reiterated that, on July 8, 2022, it denied Solondz's request due to "generalized anxiety disorder, sleep disorder, and use of medication (mirtazapine/Remeron)." [000290]

- On April 14, 2023, the AMCD Manager denied Solondz's request based only on Solondz's "history of Generalized Anxiety Disorder, Obstructive Sleep Apnea (OSA) treated with Continuous Positive Airway Pressure (CPAP), Atrial Fibrillation (A-Fib) along with the use of the aeromedically unacceptable medication Mirtzapine (Remeron)." [0000109]

Underscoring that the FAA did not consider these conditions sufficient basis for a denial, its only mention was in the July 28, 2022 denial at the very end: the FAA requested additional medical records that Solondz may have concerning the optic neuritis and melanoma. [000457 (requesting updated eye and skin exams if Solondz reapplied for a Special Issuance)] Thus, neither condition served as the basis for that denial (but Remeron did). Solondz diligently obtained and provided those updated exams. On July 7, 2022, Dr. Pelak [000228] performed the special eye exam and found nothing of concern. *See also*, FAA Form 8500-8 Eye Report, submitted Aug. 8, 2022 [000234 (Dr. Pelak noting no concerns)] On August 22, 2022, Dr.

42

Kelly Thomas performed an updated skin examination and found nothing of concern regarding the prior melanoma diagnosis and treatment. [000237-39]

Further demonstrating the conditions' relative lack of importance, the FAA expressly conditioned these requests for additional information on Solondz discontinuing his use of Remeron for at least 60 days, and then reapplying. [000457-58] Solondz did not stop using Remeron because, for him, it was effective and without significant side effects. Nonetheless, Solondz obtained and provided to the FAA the additional medical exams for optic neuritis and malignant melanoma—both showing no concern. Yet, the FAA ignored both conditions until after Solondz filed a petition for review with this Court. And in the Air Surgeon Denial, the FAA's pretext ignores that for over two years, Solondz's medical exams show neither condition poses a concern. [*See* 000022-28]

**2.    The medical evidence demonstrates optic neuritis is not a safety concern; any denial based upon optic neuritis is arbitrary, capricious, and contrary to law.**

None of Solondz's medical records support a conclusion that a prior optic neuritis condition impacts Solondz's aeromedical fitness.  In fact, the medical exams demonstrate normal eye function without concern. In the Air Surgeon Denial, the FAA cherry-picks several references to a potential optic condition dating back to January 2020, including that an MRI of the area was performed then.  [000025 (the MRI made no conclusions)] Nowhere in the Air Surgeon Denial does the FAA point

43

to any medical exam finding optic neuritis limited Solondz's airworthiness. This is because the medical records ambiguously referenced by the FAA show the opposite.

- On July 29, 2021, Dr. David Borges evaluated Solondz's optic nerve and related medical records. He found: the globes were "[n]ormal in size and shape, without abnormal enhancement. Slight left-sided optic disc thickening"; "The optic nerves are otherwise normal in size and signal intensity, without abnormal enhancement. The chiasm is normal; no suprasellar masses. Mild asymmetric prominence of the left optic nerve sheath. No abnormal enhancement, adjacent fat stranding, or mass"; "No mass, infiltration or enhancement of orbital fat"; and the extraocular muscles were "[n]ormal in size, shape and enhancement." [000207] Dr. Borges recommended a follow-up every two years. [000206]

- As the FAA noted, only one year later, on July 7, 2022, Dr. Vitoria Pelak (a neuro-ophthalmologist) performed a check-up and indicated "no significant vision loss." [000025; *see also*, 000228; 000083-84] Nonetheless, the FAA misleadingly described this positive result as "[t]esting did not confirm a diagnosis." [000025] In fact, Dr. Pelak described the prior eye swelling as "resolved" and months prior had referred Solondz back to "Dr. Ehrlich (local, referring ophthalmologist)

for normal monitoring. [000228] Dr. Pelak repeated this note in her August 8, 2022 FAA Form 8500-8 eye report: "Edema of optic disc of Left (sic) eye, that appears to have resolved. Return to care of normal ophthalmologist with Dr. Ehrlich." [000234]

- On July 31, 2023, a year after the FAA's July 8, 2022 denial and a year before the current, operative denial, Dr. Ehrlich again evaluated Solondz and, according to the FAA, "reported a favorable eye exam." [000025; *see also*, 000073-74; 000079-82] Dr. Ehrlich's report also confirmed that Dr. Pelak had "cleared" Solondz concerning optic neuritis. [000082]

Thus, both doctors evaluated Solondz for optic neuritis multiple times between 2020 and 2023, neither identified anything of concern, and both cleared him.

Unable to disqualify Solondz due to optic neuritis based on the actual medical findings in these records, the FAA instead points to a single study to speculate that if a condition of optic neuritis were present, then it could lead to an aeromedically significant concern. [000027] The FAA bases this pretextual rationale on unfounded conjecture about risks associated with optic neuritis. [*Id.*] The FAA acknowledges that "[w]hile many people with optic neuritis fully recover and do well"—like Solondz—a single medical study supposedly reported "about a 25-50% risk of individuals with optic neuritis developing multiple sclerosis within 15 years." [*Id.*]

Despite noting that "[w]e accept that this risk likely decreases with age"—again, like Solondz—the FAA still stated it is "unable to assure safe operation without review of all the pertinent clinical documentation and test results, as well as a review of ongoing regular evaluations that screen for progression or relapse." [000027] But Solondz provided—and the FAA referenced earlier in the denial—the "pertinent test results". And despite his doctor recommending follow-up only every two years, Solondz had his eyes evaluated annually.

Thus, to the extent the FAA denied the Special Issuance based upon potential optic neuritis, the FAA is simply speculating about what **might** occur in rare circumstances, based on a single study that identified less than half of participants who reported such conditions, all the while acknowledging that there is no such evidence in Solondz's medical records to make such a conclusion and recognizing that the risk decreases with age (Solondz is 63 years old). [000027] An obvious pretext, the FAA's position on optic neuritis is arbitrary, capricious, and contrary to law.

### 3. The medical evidence demonstrates that a prior melanoma is not a safety concern; any denial based upon melanoma is arbitrary, capricious, and contrary to law.

None of Solondz's medical records support a conclusion that a prior melanoma condition impacts Solondz's aeromedical fitness. In fact, Solondz's history of routine skin examinations demonstrates normal results with no issues.

46

Nonetheless, in the Air Surgeon Denial, the FAA improperly combines references to this past condition with the false insinuation that Solondz failed to provide pertinent medical records and speculation that a "malignant" version of melanoma carries potential future risks. [000024 & 27]

First, so there is no confusion, Solondz has no history of malignant melanoma. Rather, over **ten** years ago (in May 2014), he was diagnosed with a single melanoma **in situ**, which was removed. [Aug. 22, 2002 Dr. Thomas Letter, 0000237-239] In the Air Surgeon Denial, the FAA acknowledges this fact. [000027 (noting receipt of Dr. Thomas' report and related medical records, and that Solondz's prior diagnosis was "melanoma in situ, but not malignant melanoma.")]

Second, Solondz's 14-plus year history of routine skin examinations demonstrates normal results with no issues. In the FAA's prior July 8, 2022 denial, the FAA demanded that before Solondz reapplies, he seek yet another skin evaluation. [0000457 at ¶ 7] Despite already receiving regular screenings and his doctor advising additional follow-up only annually, Solondz diligently complied. On August 22, 2022, Dr. Kelly Thomas again conducted a complete skin exam of Solondz and did not observe any spots that were "new, bleeding, growing or changing." [000237] Dr. Thomas wrote a letter to the FAA explaining Solondz's history of diligent screening, and concluding that no concern was warranted:

> I have been following Mr. Solondz for skin cancer screenings since 2010. In 2014 we diagnosed him with a melanoma in situ. A state Tis.

47

He has been receiving every six month skin checks since that time. **As this was not an invasive cancer, prognosis is excellent without expected progression to invasive or metastatic disease.**

We will continue with every six month visits but it is reasonable to move to yearly visit in the future if we do not find further concerning cancers.

[000239 (emphasis added)] Thus, the doctor who originally diagnosed Solondz with melanoma in 2014 has been monitoring Solondz every six months, recommends only annual screenings, and, as recently as August 2022, cleared Solondz of concern of "expected progression to invasive or metastatic disease."

Third, and contrary to the insinuations in the Air Surgeon Denial, the FAA has the relevant medical opinion for the melanoma. Dr. Thomas included with his letter the "most recent visit [August 2022] as well as the pathology reports over the last 11 years for Mr. Solondz." [000239 (emphasis added)] Unable to dispute the "all clear" medical opinion of the very doctor that diagnosed, treated, and monitored Solondz for over a decade, the FAA simply ignores the evidence and demands Solondz undergo additional, medically unnecessary exams in order for the FAA to even consider his application for a Special Issuance. [Air Surgeon Denial, 000027 ("We will need current reports from your treating neurologist physician about the melanoma…")] Stated differently, the FAA is arbitrarily and capriciously assuming that there are additional medical records that it does not have and that those would

be necessary for it to evaluate these medical issues; however, the only evidence in the record does not support the FAA's denial based on these medical issues.

Fourth, the FAA's speculation about the possible effects of unrelated melanoma conditions is not a proper basis to deny Solondz's Special Issuance. Despite acknowledging Solondz's past medical issue was "melanoma in situ" [000027], the FAA articulates as the basis for the denial that "Malignant melanoma, **if this condition is present**, carries a high risk of spread or metastasis, including high risk of spreading to the brain where it may cause cognitive problems or seizures." [*Id.* (emphasis added)] That condition **is not** present. [000027; 000237-39] The FAA's flight of fancy from a condition Solondz does not have to worst-case scenarios that might develop from that condition underscores the pretextual nature of this issue.[7] Because Solondz's medical records do not support any legitimate conclusion that Solondz's airworthiness is impaired by a "malignant melanoma," the FAA's speculative denial on that basis is arbitrary, capricious, and contrary to law.

**4. It is arbitrary, capricious, and contrary to law to deny Solondz a Special Issuance based on a single atrial fibrillation event over 20 years ago.**

It is unclear whether the Air Surgeon Denial includes as a basis Solondz's long-ago A-Fib event because the FAA did not include this issue in that denial.

---

[7] It is not surprising that none of the FAA's prior denials included any mention of concern by the FAA of the long-past melanoma in situ.

49

[000022-28] But, the FAA did include A-Fib as a basis for denial in the AMCD April 2024 Denial, which prompted the First Petition. [000038] This pretextual reason, too, is unsupported by the medical record.

Solondz's medical records make clear that his "history" of A-Fib relates to a single cardiac event in 2001, which was caused by use of Sudafed (a popular over-the-counter decongestant). [000679 & 669] Nor has Solondz suffered recurring heart issues. [*E.g.*, 000939-40 (Oct. 2, 2022 letter from Dr. Robert Dunn, finding: "He has had no subsequent episodes or incidents and has not had atrial fibrillation since January 2001" and "There is no evidence of any heart disease whatsoever."); 000991 (Form 8500-8 from January 15, 2010 ("NO FURTHER EPISODES ATRIAL FIBRILLATION PAST 9 YEARS."))] Accordingly, there was no basis in the record for the FAA to deny Solondz a special issuance based on the single event of A-Fib 23 years prior. Such inclusion was clearly pretextual. To the extent the FAA continues to rely on this as a basis for Solondz's denial, it is arbitrary, capricious, and contrary to law.

**5.    It is arbitrary, capricious, and contrary to law to deny Solondz a Special Issuance based on a sleep apnea condition.**

Although the FAA refers to sleep apnea in the Air Surgeon Denial, it is not an express basis for the denial. [000022-28] When listing out Solondz's several historic—and often no longer relevant—medical conditions, the denial notes Solondz's sleep apnea condition. [000025 & 27] However, unlike the other

50

conditions upon which the FAA bases its denial—Remeron use, potential returning optic neuritis, and potential future malignant melanoma—the FAA acknowledges that "[a]ppropriate treatment can mitigate" the risks associated with sleep apnea. [000027] The Air Surgeon Denial simply reminds Solondz that "[t]o consider for aeromedical certification, we require that the treatment is used and complies with" a certain Status Report Recertification[8] available via a link provided in the denial. [000028] The Air Surgeon Denial neither evaluates Solondz's medical records related to sleep apnea nor states that the treatment Solondz undertakes to treat sleep apnea is insufficient.

In any event, the medical records demonstrate that Solondz's sleep apnea is being properly treated. [*E.g.*, 000025 (Air Surgeon Denial, acknowledging Solondz "improved satisfactorily" in a 2021 sleep study); *see also*, 000173-185 (June 2021 sleep study)] Moreover, to the extent the FAA could properly impose sleep apnea treatment as a condition upon a Special Issuance,[9] the record demonstrates Solondz's

---

[8] Notably, this OSA Status Report – Recertification states at its end that it is **not** required to receive a Medical Certificate, but that providing it could significantly reduce FAA application review time. *OSA Status Report – Recertification*, Federal Aviation Administration, https://www.faa.gov/ame_guide/media/OSA_RECERT_Status_Summary.pdf (last visited Oct. 15, 2024) ("Note: This OSA RECERTIFICATION Status Report is NOT required; however, it will help to significantly DECREASE FAA review time.")

[9] *See* 14 CFR § 67.401(d) (assigning to the Federal Air Surgeon the authority to impose conditions on a Special Issuance); *see also*, 000242 (Form - Airman Compliance With Treatment Obstructive Sleep Apnea (OSA)).

51

willingness to meet such conditions. [*E.g.*, 000242 (Airman Compliance with Treatment Obstructive Sleep Apnea (OSA) form dated August 29, 2022, wherein Solondz certifies that he "will commence using the new [BPAP] machine" once it arrives)] Thus, to the extent the FAA pretextually relies on a sleep apnea condition as a basis for denying Solondz the Special Issuance, it is arbitrary, capricious, and contrary to law.

## **RELIEF SOUGHT**

This Court should order the FAA to grant Solondz a Special Issuance for a First-Class Airman Medical Certificate, just as the FAA routinely grants such Special Issuance to other applicants who use similar antidepressant medications.

Section 67.401(a), 14 C.F.R., permits the Air Surgeon, at her discretion, to grant a Special Issuance, valid for a specific period, to a person who does not meet the requirements of an Airman Medical Certificate. 14 C.F.R. §§ 67.107(c), .207(c), and .307(c) require an airman applicant to be absent of:

> …personality disorder, neurosis, or other mental condition that the Federal Air Surgeon, based on the case history and appropriate, qualified medical judgement relating to the condition involved, finds— (1) Makes the person unable to safely perform the duties or exercise the privileges of the airman certificate applied for or held; or (2) May reasonably be expected, for the maximum duration of the airman medical certificate applied for or held, to make the person unable to perform those duties or exercise those privileges.

The Air Surgeon has long taken the position that a clinical diagnosis of a mental health condition, such as depression and/or anxiety, automatically either makes an

airman unable to safely perform the duties or exercise the privileges of the airman certificate applied for or held or may make the airman unable to perform those duties or exercise those privileges for the maximum duration of the airman medical certificate applied for or held. In almost as broad of strokes as the blanket assumption of aeromedical incompetency, the Air Surgeon has also objectively permitted the use of certain antidepressant medications for the clinical management of mental health conditions.

As mentioned above, the Air Surgeon recently announced the conditional acceptance of SNRIs Desvenlafaxine (Pristiq), duloxetine (Cymbalta), and Venlafaxine (Effexor), for Special Issuance.[10] Pursuant to the Federal Aviation's HIMS AME Checklist, an Airman with an SSRI/SNRI-related Authorization for Special Issuance would be required to perform the following tasks to be granted a Medical Certificate:

- Face-to-face HIMS AME evaluations every six (6) months;

- Produce a treating psychiatrist report every six (6) months;

- If clinically indicated, produce a neuropsychologist report and routine Cog Screen-AE every six (6) months;[11]

---

[10] *Antidepressant Medications*, Federal Aviation Administration, https://www.faa.gov/ame_guide/media/Antidepressant_Medications.pdf (last visited Oct. 14, 2024).

[11] Prior to December 15, 2022, this evaluation, including the CogScreen-AE, was required for the maintenance of an SSRI/SNRI Special Issuance.

CORE/3526649.0002/193417506.1

- Obtain and produce chief pilot reports every three (3) months (for 1st or 2nd class medical certificates); and

- Produce drug testing and therapy (treatment) reports for SSRI/SNRI usage.[12]

In consideration of these established requirements, Solondz seeks a Special Issuance for a First-Class Airman Medical Certificate with the following similar requirements:

- Face-to-face HIMS AME evaluations every six (6) months;

- Produce a treating psychiatrist report every six (6) months; and

- Produce drug testing and therapy (treatment) reports for antidepressant usage.

## <u>CONCLUSION</u>

For the foregoing reasons, Solondz respectfully requests this Court reverse the FAA's decision denying Solondz a Special Issuance, and order the FAA to issue a Special Issuance for a First-Class Airman Medical Certificate with the above-described requirements (as well as any other reasonable and necessary requirements based on an individualized assessment of Solondz's medical application).

Oral argument is respectfully requested.

---

[12] *See HIMS AME Checklist – SSRI Recertification/Follow Up Clearance*, Federal Aviation Administration, https://www.faa.gov/ame_guide/media/HIMS_AME_Checklist_SSRI_Recertification.pdf (last visited Oct. 9, 2024).

CORE/3526649.0002/193417506.1

October 21, 2024                Respectfully submitted,

                                */s/* Brandon R. Nagy_____
                                Zane A. Gilmer, Esq.
                                STINSON LLP
                                1144 Fifteenth Street, Suite 2400
                                Denver, CO 80202
                                Tel: (303) 376-8416
                                Email: zane.gilmer@stinson.com

                                Brandon R. Nagy, Esq.
                                STINSON LLP
                                1775 Pennsylvania Avenue, NW, Suite 800
                                Washington, D.C. 20006
                                Tel: (202) 728-3010; Fax: (202) 572-9964
                                Email:  brandon.nagy@stinson.com

                                Joe LoRusso, Esq. *
                                RAMOS LAW
                                10190 Bannock St., Suite 200
                                Northglenn, CO 80260
                                Tel: (720) 580-8305
                                Email: jlorusso@ramoslaw.com
                                (*application for admission forthcoming)

                                *Counsel for Petitioner Michael Solondz*

CORE/3526649.0002/193417506.1

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this document, **excluding** the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32, contains **<u>12,773</u>** words.

2.    This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word in 14 pt. Times New Roman.

Dated:  October 21, 2024                    /s/ Brandon R. Nagy
                                            Brandon R. Nagy

CORE/3526649.0002/193417506.1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 21, 2024, I electronically filed the foregoing

with the Clerk of the Court by using the Appellate CM/ECF system.

I further certify that the participants in the case are registered CM/ECF users

and that service will be accomplished by the Appellate CM/ECF system.

Dated:  October 21, 2024                    /s/ Brandon R. Nagy

                                            Brandon R. Nagy

CORE/3526649.0002/193417506.1